1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALAN B. REICHARD, Regional Director of the Thirty-Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board,**<br><br>                    **Petitioner,**<br><br>          **v.**<br><br>**FOSTER POULTRY FARMS,**<br><br>                    **Respondent.** | **1:06-CV-0238 OWW LJO**<br><br>**ORDER GRANTING PETITION FOR TEMPORARY INJUNCTION (29 U.S.C. § 160(j))** |

## I.   INTRODUCTION

Petitioner Alan B. Reichard ("Petitioner"), Director of the Thirty-Second Region of the National Labor Relations Board, on behalf of the Board petitions for a temporary injunction under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j), requiring Respondent Foster Poultry Farms ("Respondent") to recognize and bargain with the League of Independent Workers ("the League") during the time the National Labor Relations Board ("NLRB" or "the Board") considers the pending unfair labor practice complaint against Respondent.

**1**

Respondent opposes the motion.

## II.   PROCEDURAL HISTORY

On February 24, 2006, the Board unanimously authorized Petitioner to seek a 10(j) injunction against Respondent pending the NLRB's decision in the administrative hearing case.  Doc. 2, Mem. in Supp, 2.  The petition and memorandum in support were filed on March 1, 2006.  Doc. 1, Pet.; Doc. 2, Mem. in Supp.  The memorandum in opposition was filed by Respondent on March 15, 2006.  Doc. 32, Mem. in Opp.  The reply was filed on March 17, 2006.  Doc. 38, Reply.

## III.   BACKGROUND

Respondent is a family-owned-and-operated business engaged in the production of poultry products.  Respondent was founded in 1939 and has been headquartered in Livingston, California since the 1950s.  Over 2,400 employees work at the Livingston facility. In 2003, Respondent's Livingston employees were represented by the United Food and Commercial Workers.  In 2003, the bargaining unit employees voted to decertify the UFCW.

The League of Independent Workers was formed in 2004 to represent Respondent's workers.  Ralph Meraz is the League's primary spokesman.

On or about November 7 and 8, 2004, the League and the UFCW participated in an election to represent various employees of Respondent at the Livingston facility.  Two thousand four of 2,303 eligible voters cast ballots in the November 2004 representation election.  Of the 2,004 votes cast in the election, 1,151 employees cast ballots for the League and 142 employees for the UFCW.  Seven hundred six employees voted

**2**

against union representation of any kind.  The Board certified the League as Respondent's employees' bargaining representative shortly thereafter in 2004.

Respondent recognized the League and began labor negotiations.  The parties met on at least a dozen occasions over the next six months.  Meraz negotiated on behalf of the League. Negotiations reached impasse in early May 2005.  No contract was in place.

The International Association of Machinists and Aerospace Workers ("IAM") is an international organization with over 730,000 members across North America.  District Lodge 190 of the IAM represents over 14,000 workers in California and Nevada who perform craft and trade work.  District Lodge 190 has assets totaling over $500,000 and is governed by its own constitution and bylaws as well as the IAM constitution and bylaws.

The League conducted an affiliation vote on September 11, 2005, to determine whether it would affiliate with the IAM.  Any current employee at the Livingston plant was allowed to vote. Aff. & Ex., 3, 25.  Of the roughly two thousand eligible voters, id., 21, 25, nine hundred forty-three employees voted, id., 25. Nine hundred eighteen votes were cast in favor of affiliation, twenty-one against, and there were four blank ballots.  Id., 25, 51.  After the affiliation vote, the IAM sent a letter to Respondent seeking to re-start negotiations.  Respondent replied that it did not recognize the League as having properly affiliated with IAM, and would not engage in negotiations.  Doc. 32, Mem. in Opp., 3-8.

On or about January 9, 2006, Petitioner issued a complaint

**3**

1  alleging that Respondent violated the National Labor Relations

2  Act, 29 U.S.C. § 151, *et seq.*, by declining to negotiate with and

3  provide certain information to the League.  Petitioner now

4  requests an injunction to require Respondent to recognize and

5  bargain with the League during the pendency of the administrative

6  proceedings and Board decision which are represented to last two

7  to three years.

### IV.   LEGAL STANDARD

9  Title 29, Section 160, of the United States Code provides in

10  relevant part:

11  The Board shall have power, upon issuance of a

12  complaint as provided in subsection (b) of this section

13  charging that any person has engaged in or is engaging

14  in an unfair labor practice, to petition any United

15  States district court, within any district wherein the

16  unfair labor practice in question is alleged to have

17  occurred or wherein such person resides or transacts

18  business, for appropriate temporary relief or

19  restraining order.  Upon the filing of any such

20  petition the court shall cause notice thereof to be

21  served upon such person, and thereupon shall have

22  jurisdiction to grant to the Board such temporary

23  relief or restraining order as it deems just and

24  proper.

25  29 U.S.C. § 160(j).

26  To secure relief under section 10(j), the Regional Director

27  must show "either (1) a combination of probable success on the

28  merits and the possibility of irreparable harm or (2) the

**4**

existence of serious questions going to the merits, the balance of hardships tipping sharply in its favor, and at least a fair chance of success on the merits." *Miller v. California Pacific Med. Ctr.*, 19 F.3d 449, 456 (9ᵗʰ Cir. 1994) (quoting *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 977 (9th Cir.1992)).  This formulation reflects the traditional "sliding scale" of equity jurisprudence where "the required degree of irreparable harm increases as the probability of success decreases." *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987); *United States v. Nutri-cology, Inc.,* 982 F.2d 394, 398 (9th Cir.1992) ("where the government can make only a colorable evidentiary showing of a violation, the court must consider the possibility of irreparable injury").  In *Miller*, this traditional formulation was modified in one respect.  In the context of a section 10(j) petition, the court must evaluate the traditional equitable criteria "through the prism of the underlying purpose of section 10(j), which is to protect the integrity of the collective bargaining process and to preserve the Board's remedial power while it processes the charge." *Miller,* 19 F.3d at 459-60.  The Board's ability to meaningfully adjudicate disputes arising within its jurisdiction must be balanced against the respondent's showing of hardship.  *Id.* at 460.  *Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates*, 241 F.3d 652, 661 (9ᵗʰ Cir. 2001).

**V.   ANALYSIS**

1.   Likelihood of success on the merits

As an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits.  Where the moving party

**5**

shows only a "fair" chance of success on the merits, in contrast to "probable" success on the merits, the party also must show there are serious questions going to the merits of the case and that the balance of the hardships tips decidedly in its favor. *Miller*, 19 F.3d at 460.

In assessing whether the Board has met its burden, it is necessary to factor in the district court's lack of jurisdiction over unfair labor practices, and the deference accorded to NLRB determinations by the courts of appeals. *See NLRB v. City Disposal Sys., Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 1510, 79 L.Ed.2d 839 (1984) ("[O]n an issue that implicates [the Board's] expertise in labor relations, a reasonable construction by the Board is entitled to considerable deference[.]"); *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979) ("Of course, the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute."). While the district court is not required to defer to the Board in deciding whether interim relief is "just and proper," it should evaluate the probabilities of the complaining party prevailing in light of the fact that ultimately, the Board's determination on the merits will be given considerable deference. By the same token, because it is the Board and not the district court which has primary responsibility for declaring federal labor policy, even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel. In short, the Board can make a threshold showing of likelihood of success

**6**

1 by producing some evidence to support the unfair labor practice
2 charge, together with an arguable legal theory. *Miller*, 19 F.3d
3 at 460.

4     If the respondent concedes the substance of the unfair labor
5 practice charge, or if the Board demonstrates that it is likely
6 to prevail on the merits, the court presumes irreparable injury.
7 If the charge is disputed, or if the Board has only a fair chance
8 of succeeding on the merits, the court must consider the
9 possibility of irreparable injury.  Id.

10     An employer has an obligation to bargain with a successor
11 union where an affiliation vote is conducted with adequate due
12 process safeguards and where the organizational changes are not
13 so dramatic that the post-affiliation entity lacks substantial
14 continuity with the pre-affiliation union.  *Sullivan Bros.*
15 *Printers*, 317 N.L.R.B. 561, 562 (1995), enf'd 99 F.3d 1217 (1st
16 Cir. 1996).  Respondent has the burden of proof on each of these
17 factors, *Ridgewell's, Inc.*, 334 N.L.R.B. 37, 42 (2001), by a
18 preponderance of the evidence, *J. W. Fergusson & Sons*, 299
19 N.L.R.B. 882 n. 2 (1990) (due process), *Whitewood Maintenance*
20 *Co.*, 292 N.L.R.B. 1159, 1209 (1989) (continuity).

21     Although most union mergers/affiliations result in some
22 degree of change to the union's organizational structure, the
23 Board will intervene in such internal union matters only where it
24 finds that the affiliation raises a question concerning
25 representation and, consistent with this approach, the Board will
26 interject itself only in the most limited of circumstances
27 involving such internal changes.  *Sullivan Bros.*, 317 N.L.R.B. at
28 562.  Here, the Board has made such a decision and seeks to

**7**

1  preserve bargaining representative status for the League pending
2  the outcome of a Board decision on the merits.
3  a.   Due Process

4  Regarding the due process factor, the Board focuses on
5  whether the members received adequate notice of the vote, whether
6  there was adequate opportunity for discussion before the vote,
7  and whether the vote was conducted by secret ballot.
8  *Ridgewell's*, 334 N.L.R.B. at 42.

9  The evidence establishes that the League conducted a general
10  membership meeting and vote on September 11, 2005, to determine
11  whether to affiliate with the International Association of
12  Machinists and Aerospace Workers ("IAM").   Doc. 2, Mem. in Supp.,
13  2.   Approximately ten days before the September 11 meeting and
14  vote, League leaders distributed flyers to the employees at
15  Respondent's facility concerning the proposed affiliation and the
16  meeting.   The flyers included translations into Punjabi and
17  Spanish.   At the same time, the League mailed employees postcards
18  concerning the September 11 affiliation meeting.   At the meeting,
19  information regarding the proposed affiliation was provided in
20  two sessions.   One session was conducted in English and Punjabi,
21  and the other in Spanish and Portuguese.   League leaders
22  explained the details of the proposed affiliation and gave
23  employees the opportunity to discuss and ask questions about the
24  proposed affiliation.   Many questions were asked about the dues
25  structure and benefits and pensions.   All unit employees were
26  entitled to vote on the affiliation.   The vote used voting
27  booths, secret ballots, election monitors, and a sealed ballot
28  box.   The result was 918 for affiliation, 21 against, with 4 void

**8**

ballots, for a total of 943 voters.  Aff. & Ex. in Supp. of Pet.
[hereinafter, Aff. & Ex.], 3, 15, 16, 21, 49-51, 101-108, 110-22.

Respondent argues that the court cannot find that due
process was adequate on the existing record.  Respondent first
points out that the League has not provided attendance sheets for
the discussion sessions.  The League has provided affidavits that
state that more than 800 employees attended the discussion
sessions.  Aff. and Ex., 3 ("800+"), 21 ("950").  Respondent has
not challenged this evidence.

Respondent also states that Petitioner has not established
exactly how many employees received advance notice.  "For
example, although the League claims to have purchased over 2,000
mailing labels to mail notices to employees about the affiliation
vote, [Petitioner] supplied no evidence to corroborate that these
were actually mailed to employees, or to show how many employees
actually received notices.  Likewise, [Petitioner] fails to
provide any evidence showing how many employees actually received
the handbills it claims were distributed on or about August 29
and September 1, 2005."  Doc. 32, Mem. in Opp., 19 n. 10.

Petitioner has provided evidence that handbilling regarding
the September 11 meeting was conducted at the plant gate on both
August 29 and September 1, 2005, before and after shift changes.
Aff. & Ex., 3, 21.  The flyers were printed in English and
Spanish, and handwritten in Punjabi.  Ralph Meraz, the League's
"lead", states that "[t]he Union also mailed a card to the
membership's homes."  Aff. & Ex., 22.  The card announces "Our
Next Meeting," states the venue, "Livingston Portuguese Hall,"
and gives the date and times of the information sessions, all in

**9**

both English and Spanish.  Aff. & Ex., 30 (Ex. 2 to 10/13/05 Aff. of Ralph Meraz).

At oral argument before the court on March 22, 2006, Respondent questioned due process on the grounds that less than half the unit employees voted in the affiliation election. Respondent does not present evidence that any unit employee was prevented from voting or was denied notice of the meeting.  In *Minn-Dak Farmers Cooperative*, 311 N.L.R.B. 942 (1993), the Board held that the due-process requirements were met by providing the entire unit with an opportunity to vote.  In doing so, the Board rejected the employer's arguments that the entire membership of the union must be permitted to vote and that a majority of those eligible to vote rather than those voting is necessary. *Minn-Dak*, 311 N.L.R.B. at 945-47; *see also*, National Labor Relations Board, *An Outline of Law and Procedure in Representation Cases*, § 11-100 (July 2005).

> In affiliation cases . . . the Board faces the
> difficult task of reconciling the two partly
> inconsistent goals of guaranteeing employees their free
> choice of bargaining representative and fostering
> stable collective bargaining relationships. . . . [T]he
> Board requires, consistent with the policy of free
> choice, that the election procedure be conducted in
> accordance with minimal standards of "due process," so
> that the outcome accurately reflects the employees'
> true desires.

Note, *Union Affiliations and Collective Bargaining*, 128 U. Pa. L. Rev. 430, 433 (1979).

1    As in *CPS*, there is no evidence that the voters were not
2  adequately apprised of the issues before them, that anyone
3  objected to the voting procedures, or that the result did not
4  accurately reflect the votes cast or the true sentiments of the
5  members. *CPS*, 324 N.L.R.B. at 1019. Respondent has failed to
6  show that the affiliation vote was conducted in derogation of the
7  employees' due-process rights, nor has Respondent provided legal
8  authority that less than one half of all eligible workers cannot
9  lawfully approve an affiliation. If a majority vote of all
10  employees is required to approve an affiliation, it is
11  Respondent's burden to provide such legal authority. *Minn-Dak* is
12  to the contrary.

13 b.    Continuity

14    Corresponding to the concern with stability [of the
15    collective bargaining relationship] is a test for
16    "continuity of representation," by which the Board
17    seeks to determine whether replacement by the successor
18    union disrupts the bargaining relationship established
19    by its predecessor.

20 Note, 128 U. Pa. L. Rev. at 433.

21    To prevail, Respondent must demonstrate that the affiliation
22  resulted in changes that are sufficiently dramatic to alter the
23  identity of the League, and thus in the substitution of an
24  entirely different union as the employees' representative. *CPS*,
25  324 N.L.R.B. at 1020 (*citing Western Commercial Transport*, 288
26  N.L.R.B. 214, 217-18 (1988)). The Board reviews such claims
27  under a "totality of the circumstances" standard and takes into
28  consideration several factors, including: continued leadership

**11**

responsibility by existing union officials; continuation of the
manner in which contracts are negotiated; perpetuation of
membership rights and duties; eligibility for membership;
qualifications to hold office; oversight of executive council
activity; the dues/fees structure; authority to change provisions
in its governing documents; frequency of membership meetings; and
preservation of the prior union's physical facilities, books, and
assets. *Mike Basil Chevrolet*, 331 N.L.R.B. 1044, 1045-46.

Most affiliations or mergers change a union's organizational
structure to some extent, but the natural and foreseeable
consequences of such a combination does not automatically raise a
question concerning representation. As the Supreme Court in
*N.L.R.B. v. Food & Commercial Workers Local 1182 (Seattle-First
National Bank)*, 475 U.S. 192 (1986), recognized, change is the
natural consequence of ordinary, valid reasons for union
affiliations and mergers, such as increased financial support and
bargaining power. *Seattle-First*, 475 U.S. at 199 n. 5. "The
notion that an organization somehow loses its identity and
becomes transformed . . . because it acquires more clout and
becomes better able to do its job is an absurdity and flies in
the face of a clearly stated congressional objective." *CPS*, 324
N.L.R.B. at 1020-21 (citing *Insulfab Plastics, Inc.*, 274 N.L.R.B.
817, 823 (1985)).

Petitioner's evidence shows that the League retained all of
its officers, all of whom perform the same duties they previously
performed. Aff. & Ex., 4; *see CPS*, 324 N.L.R.B. at 1022 ("[t]his
retention of the [union's] president as CPS group leader
establishes substantial continuity of leadership"). The League

**12**

will also continue to choose its own officers, shop stewards,
negotiating committee members, and executive committee members.
Aff. & Ex., 5.  Meraz continues as lead negotiator, Aff. & Ex. 26
("[m]y duties after the affiliation have not changed at all; my
responsibility as a decision-maker is still the same"), together
with an IAM official as co-lead negotiator.  Id.  "The League,
its officers, and members will continue to determine how it wants
to proceed in negotiations and its positions on issues that are
up for negotiation."  Id.

> There is no evidence that [the larger union's co-lead
> negotiator] will serve as more than a valued source of
> expertise in negotiations and arbitrations, and
> certainly none that he will act inconsistently with the
> CPS employees' desires in either context.  It is
> precisely to gain the benefit of such expertise that
> independent unions often affiliate with stronger
> internationals[.]

*CPS*, 324 N.L.R.B. at 1023; Aff. & Ex., 23 ("[Meraz] explained
that [IAM] would assist [the League] in legal areas because they
have more experience in negotiation").  This means the League
bargainers are the same and the history of collective bargaining
with the employer remains intact.

Under the Affiliation Agreement, all current dues-paying
members of the League will be entitled to all rights and
privileges of IAM membership and will have their years of good-
standing membership in the League recognized and credited by the
IAM in accordance with the IAM constitution.  Aff. & Ex., 7.

The League has retained control over its property after the

**13**

1  affiliation, Aff. & Ex., 5, and has acquired a new office with

2  computer and phone systems to replace the trailer that served as

3  the League's old office, Aff. & Ex., 46-47.

4      Respondent argues that Petitioner cannot on this record show

5  that the League and IAM are "sufficiently alike" to permit their

6  affiliation.  Doc. 32, Mem. in Opp., 12.  However, it is

7  Respondent's evidentiary burden to show the converse.  Respondent

8  characterizes the changes which the League will ultimately be

9  required to undergo as "sweeping."  Id., 16.  Specifically,

10  Respondent alleges, citing the IAM constitution, that the League

11  must: (1) Forbid Meraz and any other representative of the League

12  from serving as an officer within the IAM until he or she has

13  attained at least one year of tenure; (2) forbid Meraz and any

14  other representative of the League from serving as an officer of

15  a local lodge until he or she has attained at least one year of

16  tenure; (3) require each member to pay monthly dues of at least

17  two times the weighted average hourly earnings; (4) require each

18  member to pay a monthly per capita tax to the Grand Lodge "equal

19  to the weighted average on a union-wide basis of one hour's

20  earnings of each Local Lodge member"; (5) obtain the approval of

21  the Executive Committee or the International President of the IAM

22  before declaring a strike; (6) resume work and relinquish strike

23  benefits if the Executive Committee of the IAM orders the

24  League's members to do so, regardless of the members' desire to

25  continue striking; (7) obtain the approval of the International

26  President before making any changes to the League's bylaws.  Doc.

27  32, Mem. in Opp., 16-17.

28      The focus of the continuity inquiry is whether after the

**14**

affiliation the Respondent faces an entity entirely different
from before affiliation.  The first and second factors advanced
by Respondent indicate that the League has not been subsumed into
IAM.  *See CPS*, 324 N.L.R.B. at 1020.  The size difference between
IAM and the League does not per se indicate discontinuity.  *CPS*
points out that the Board "has consistently rejected such
reasoning; so have most courts."  *CPS*, 324 N.L.R.B. at 1021 & n.
21 (citations).  The third and fourth factors do not indicate
discontinuity, because in *CPS*, the respondent also emphasized the
post-affiliation dues increases and per-capita tax.  These facts
did not indicate discontinuity:

> Local 8-397 intends to phase in the dues increase
> gradually over a five-year period.  Thus, the full
> effect of the increase will not be felt all at once.

*CPS*, 324 N.L.R.B. at 1023.
Here, the increase from five dollars per month to $20.26 (subject
to increase) will be phased in over ten years.  Aff. & Ex., 5.
This will have much lesser impact.

> Moreover, the greater financial commitment asked of
> OCAW members undoubtedly reflects to some extent the
> fact that a large international union can provide more
> extensive services than a small independent like the
> Association.  It is unlikely that the employees would
> expect to get stronger representation from OCAW
> absolutely free.

Id.  IAM has waived the per-capita tax.  Aff. & Ex., 5, 10.
Though IAM has the authority to veto a strike or order the
League to return to work, Respondent has not provided any

**15**

1  evidence of how often, if ever, IAM actually exercises these

2  powers.  It is actual practice rather than theoretical policy

3  which is controlling.  *CPS*, 324 N.L.R.B. at 1023 & n. 34.

4      Finally, the fact that authority to approve changes in the

5  League's governing documents has shifted to IAM weighs against

6  continuity.  *Mike Basil Chevrolet*, 331 N.L.R.B. at 1046.

7      Respondent relies heavily on the Board's decisions in

8  *Western Commercial Transport*, 288 N.L.R.B. 214 (1988), and

9  *Garlock Equipment Company*, 288 N.L.R.B. 247 (1988), in contending

10 that continuity of representation has been lost.  Doc. 32, Mem.

11 in Opp., 13-15.

12     In *Western Commercial Transport*, the smaller union's

13 officers were unable to continue to have any major role in

14 representing their fellow members; they were to be replaced by

15 employees of the larger district lodge who had no prior

16 connection to the unit.  *Western Commercial Transport*, 288

17 N.L.R.B. at 216.  Here, Petitioner's evidence shows that the

18 League retained all of its officers, all of whom perform the same

19 duties they previously performed, and the lead negotiator is

20 identical.  Aff. & Ex., 4.

21     In *Garlock Equipment*, the Board found that the larger

22 district lodge had veto power over the smaller union's formerly

23 exclusive authority to contract with the company.  *Garlock*

24 *Equipment*, 288 N.L.R.B. at 248.  Here, the League will continue

25 to choose its own officers, shop stewards, negotiating committee

26 members, and executive committee members.  Aff. & Ex., 5.  Meraz

27 continues as lead negotiator, Aff. & Ex., 4, 26.  "The League,

28 its officers, and members will continue to determine how it wants

**16**

1  to proceed in negotiations and its positions on issues that are

2  up for negotiation."  Aff. & Ex., 4 (James Beno, IAM Directing

3  Business Representative); *compare Garlock Equipment*, 288 N.L.R.B.

4  at 248 (ALJ properly did not credit Woltz's testimony regarding

5  post-affiliation negotiation arrangements because Woltz had never

6  been a business representative).

7      Respondent's evidence does not show that the League post-

8  affiliation is an "an entirely different union."  *CPS*, 324

9  N.L.R.B. at 1020 (*citing Western Commercial Transport*, 288

10 N.L.R.B. 214, 217-18 (1988)).  The League's leadership will

11 continue in their roles, Aff. & Ex., 4, 5, 26; members of the

12 League are entitled to all benefits of IAM membership, Aff. &

13 Ex., 7; contracts will continue to be negotiated by Meraz and

14 other League leaders, Aff. & Ex., 26; and the League has kept its

15 property after the affiliation, Aff. & Ex., 5.  See Modjeska &

16 Modjeska, *Federal Labor Law: NLRB Practice* [hereinafter, Modjeska

17 & Modjeska] § 9:11 & n. 46.  Since Respondent has also failed to

18 show lack of due process, Petitioner has demonstrated a

19 likelihood of success on the merits based on the continuity of

20 the League's functioning pre- and post-affiliation.  *See*

21 *Overstreet v. United Brotherhood of Carpenters and Joiners of*

22 *America, Local Union No. 1506*, 409 F.3d 1199, 1207 (9th Cir. 2005)

23 (deference to Board's interpretation of labor statute allows a

24 finding of likelihood of success on merely "some evidence to

25 support the unfair-labor-practice charge together with an

26 arguable legal theory") (*citing Miller*, 19 F.3d at 460).

27 2.  Irreparable Harm

28      The court must take into account the probability that

**17**

declining to issue the injunction will permit the allegedly
unfair labor practice to go unredressed and thereby render
meaningless the Board's remedial authority, leaving the employees
of Respondent without representation. *Miller*, 19 F.3d at 460.
If the Board demonstrates that it is likely to prevail on the
merits, the court presumes irreparable injury. *See Miller*, 19
F.3d at 459 (passage of statute an implied finding by Congress
that violations harm public).  If the charge is disputed, or if
the Board has only a fair chance of succeeding on the merits, the
court must consider the possibility of irreparable injury.
*Miller*, 19 F.3d at 460.

Here, Petitioner has demonstrated a likelihood of success.
Even if such likelihood were not present, Petitioner's evidence
shows a possibility of irreparable harm.

Federico Avila, a League coordinator, states:

The Employer's refusal to recognize and bargain with
the Union is really causing a lot of problems for
employees and hurting the Union's relationship with
employees.  For example, we haven't been able to get a
contract and the Union can't help defend employees if
they get into trouble at work or are fired.

. . . Because of this, . . . [m]any employees have told
me that they are scared to show their support for the
Union and don't want to attend Union meetings because
the Employer might find out that they support the
Union. [A]ttendance at Union meetings has dropped
somewhat since the Employer stopped recognizing the
Union.

**18**

1    Aff. & Ex. 239-40.

2         Ralph Meraz states:

3         The Union is not able to represent employees if they

4         have complaints or disciplinary problems with the

5         Employer. . . . It is hard to estimate how much

6         attendance has dropped because it has fluctuated,

7         however it is down from its peak when more than 1000

8         people attended the meetings, which was in the Summer

9         and Fall of 2005 prior to the Employer's withdrawal of

10        recognition from the Union.

11   Aff. & Ex. 47-48.

12        The courts have long recognized that harm of this kind,

13   withdrawal of recognition inflicted on a union, is often

14   irreparable.  In *Franks Bros. Co. v. N.L.R.B.*, 321 U.S. 702

15   (1944), the Supreme Court stated,

16        Out of its wide experience, the Board many times has

17        expressed the view that the unlawful refusal of an

18        employer to bargain collectively with its employees'

19        chosen representatives disrupts the employees' morale,

20        deters their organizational activities, and discourages

21        their membership in unions.

22   *Franks Bros. Co.*, 321 U.S. at 704.

23        In *Scott ex rel. N.L.R.B. v. Stephen Dunn & Associates*, 241

24   F.3d 652 (9th Cir. 2001), the Board argued that,

25        absent an interim bargaining order, support for the

26        Union will continue to wane.  When the Board finally

27        does grant relief, the union may find that it

28        represents only a small fraction of the employees.

**19**

> With only limited support, moreover, the Union will be
> unable to bargain effectively regardless of the
> ultimate relief granted by the Board.

*Stephen Dunn & Associates*, 241 F.3d at 667.  The court stated
that it must consider seriously the possibility that the union
could not recover.  *Stephen Dunn & Associates*, 241 F.3d at 668.
*See also Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445,
454 (1st Cir. 1990).

   Petitioner presents evidence that Respondent is using the
situation to further depress union support:

> The Employer has told employees that they do not have a
> Union and they are not represented by a Union.  I have
> heard this from more than 20 employees who reported
> that they were told this by Human Resources personnel
> and their supervisors.

Aff. & Ex. 47 (Ralph Meraz).

> The Employer has told employees that we don't have a
> union and that we don't have to pay dues. . . .
> Supervisors are also telling employees that since we
> don't have a Union, the Company can do whatever it
> wants.

Aff. & Ex., 239 (Federico Avila).

   Petitioner's evidence also shows that a normally high
employee turnover rate compounds the risk of irreparable harm to
the League.  In order to maintain support, the union must recruit
continually, and its apparent powerlessness vis-a-vis Respondent
makes this task more difficult.  Doc. 2, Mem. in Supp., 35.

   The courts have also recognized that new unions like the

**20**

League are especially vulnerable to an employer's unfair labor practices. *Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992).

Respondent does not answer Petitioner's argument regarding irreparable harm to the League. Respondent argues first that the Board's five-month delay in filing this action indicates that it does not consider the harm truly irreparable. Doc. 32, Mem. in Opp., 20 (*citing Maydanis v. Flamingo Hilton-Laughlin*, 1994 WL 739897, *4 (D. Nev. 1994); *Fuchs v. Steel-Fab, Inc.*, 356 F.Supp. 385, 388 (D. Mass. 1973)); *see Kobell v. Suburban Lines, Inc.*, 731 F.3d 1076, 1091 n. 27 (3rd Cir. 1984) ("the district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim injunctive relief has allowed the status quo to change through unexplained delay"). At oral argument, Petitioner's counsel explained that the suit-authorization process is lengthy and took a number of months. Delay in the federal bureaucracy is an unfortunate ramification of the operation of government. The Board unanimously authorized Petitioner to undertake this action, Doc. 2, Mem. in Supp., 2, and Petitioner's evidence demonstrates continuing harms. Petitioner took timely action to obtain authorization for this judicial proceeding. Respondent has not presented any evidence of harm that it has suffered or will suffer to support a defense of laches. *See N.L.R.B. v. P*I*E Nationwide*, Inc., 894 F.2d 887, 893-94 (7th Cir. 1990) (delay that causes harm is required for laches).

Respondent further claims that Petitioner's argument is based on speculation. Doc. 32, Mem. in Opp., 21. Respondent

**21**

ignores Petitioner's evidence that the employees have no
bargaining representative after withdrawal of recognition, the
loss of union support, and evidence of employer efforts to chill
employee union participation.

Respondent attempts to distinguish *Stephen Dunn & Assoc-
iates*, stating that there was no dispute about the identity of
the bargaining representative in that and other cases relied upon
by Petitioner.  Doc. 32, Mem. in Opp., 21.  This argument assumes
that where there is any doubt concerning who the bargaining
representative is, preliminary injunctive relief is improper no
matter how grave the possible harm to the union and the
employees.  Respondent has not provided legal authority for this
proposition.

Respondent argues there is no harm because Respondent
voluntarily abided by its final offer proposal to increase unit
employees' pay in November and December 2005, and consequently
unit employees are receiving all the benefit of union
representation.  Doc. 32, Mem. in Opp., 22.  Even if valid, this
argument ignores other facets of union representation, such as
grievance resolution, employee education, as to employment
rights, and union-negotiation benefits.  Petitioner's evidence
and argument regarding the continuing harms to the union itself
and the employees caused by Respondent's withdrawal of
recognition are not addressed.

Respondent argues that "[t]he only party who may be
irreparably harmed if an injunction issues is the nearly 1,500
unit employees who, by [Petitioner's] own count, did not approve
the League's affiliation with the District Lodge and the IAM.

**22**

1  These employees comprise approximately two-thirds of the

2  bargaining unit."  Doc. 32, Mem. in Opp., 22.  Respondent does

3  not contest that the affiliation vote manifested overwhelming

4  support for affiliation among the 943 employees who voted, or

5  present its own evidence that any employee was prevented from

6  voting or opposed affiliation.  If the remaining unit employees

7  had opposed affiliation, they could have voted against it.  While

8  it is possible that the same level of support for the union would

9  not be manifest now, Petitioner's evidence shows that this is

10 attributable to the Respondent's withdrawal of recognition, its

11 attempts to take advantage of the situation to further discourage

12 union support of which Petitioner has supplied evidence, and the

13 reality of a high employee turnover rate which further puts the

14 union at a disadvantage in an unstable membership.  Equity does

15 not allow a wrongdoer to profit by his wrong.  Petitioner has

16 provided evidence of tangible harm to employees in the loss of

17 bargaining representation.  Moreover, Section 10(j) orders are

18 enforceable without regard to whether the union has lost its

19 majority support in the interim.  Modjeska & Modjeska, § 9:11 &

20 n. 58.

21      Petitioner has shown more than a possibility of irreparable

22 harm.

23 3.   Balance of Hardships

24      In considering the balance of hardships, the court must

25 consider the probability that declining to issue the injunction

26 will permit the allegedly unfair labor practice to render

27 meaningless the Board's remedial authority.  *Miller*, 19 F.3d at

28 460.  Where the Board and the Respondent each make a showing of

**23**

1   hardship, the court must exercise its sound discretion to

2   determine whether the balance tips in the Board's favor. *Miller*,

3   19 F.3d at 460-61.

4        Petitioner's evidence of continuing harm centers on the

5   absence of union representation, employer discouragement of union

6   representation, employee perceptions (fostered by the Respondent)

7   that union activities are disfavored, and the loss of members and

8   chilling effect on employee union participation.  Respondent

9   repeats its argument that issuing an injunction would harm the

10  unit employees who did not participate in the election.  Doc. 32,

11  Mem. in Opp., 24.  This concern is uncorroborated by evidence.

12  This argument has been addressed.

13       Respondent argues that the court should allow the Board's

14  processes to work, since the underlying complaint will be heard

15  before the ALJ on March 28.  Id.  The Section 10(j) injunction

16  was provided by Congress in order to preserve the status quo

17  while the Board considers and decides the underlying N.L.R.B.

18  complaint about whether the employer lawfully withdrew union

19  recognition.  The law provides for appeal directly to the United

20  States Courts of Appeal, further extending the process, normally

21  a two- or three-year period.  The courts have recognized that

22  withdrawal of union recognition and refusal to bargain create a

23  real possibility that delay will render meaningless any relief

24  ultimately granted:

25       Experience under the National Labor Relations Act has

26       demonstrated that by reason of lengthy hearings and

27       litigation enforcing its orders, the Board has not been

28       able in some instances to correct unfair labor

**24**

1    practices until after substantial injury has been done.

2    Since the Board's orders are not self-enforcing, it has

3    sometimes been possible for persons violating the act

4    to accomplish their unlawful objective before being

5    placed under any legal restraint and thereby to make it

6    impossible or not feasible to restore or preserve the

7    status quo pending litigation.

8    H.R. Rep. No. 80-245 (1947), reprinted in Subcomm. on Labor

9    Senate Comm. on Labor and Public Welfare, 93d. Cong., Legislative

10   History of the Labor Management Relations Act, 1947, at 292, 433.

11   Here, Petitioner's evidence shows that the Respondent's

12   employees had a certified local union that subsequently

13   affiliated with an international union.  Respondent's withdrawal

14   of recognition of any bargaining representative; its

15   representations to the employees that the union is powerless to

16   help them; together with the high employee turnover rate in the

17   poultry-processing business which forces the union to continually

18   recruit, all tend to chill employee union participation.

19   Petitioner has demonstrated a real danger that if Respondent

20   continues to withhold recognition, employee support will erode to

21   such an extent that the employees will be without any

22   representation.  At that point, any final remedy that the Board

23   may impose would be ineffectual.  *See Asseo*, 900 F.2d at 454.

24   Respondent claims that it "only now has access to hundreds

25   of pages of documents and other evidence that [Petitioner], the

26   League, and IAM have had all along, and which [Respondent's]

27   counsel requested from [Petitioner] months ago."  Doc. 32, Mem.

28   in Opp., 24.  The only evidence offered is the declaration of

**25**

Michael J. Hogan, Esq., which states in relevant part:

> I have had several discussions with Amy Berbower,
> [Petitioner's] attorney assigned to investigate the
> League's charge, concerning the League's allegations
> and [Respondent's] position with respect to its
> bargaining obligations.  In or around October 2005, I
> asked Ms. Berbower to supply me with a copy of the
> purported affiliation agreement ("Agreement") between
> the League and the District Lodge and/or the IAM.  Ms.
> Berbower refused to provide me with a copy of the
> Agreement.

Decl. of Michael J. Hogan, ¶ 5.  The Affiliation Agreement is eight pages long.  Aff. & Ex., 7-14.  The citation does not support Respondent's assertion.

At oral argument, Respondent alleged that Petitioner had "stonewalled" requests for documents, including the IAM constitution and bylaws.  Counsel for Petitioner represented that she told counsel for Respondent that these documents were available on the Department of Labor website.  The IAM does not, in fact, allow its constitution or bylaws to be posted on any public website, including that of the Department of Labor.  Petitioner's counsel stated that discovery was not available in actions before the NLRB, and she could not give Respondent a copy of the IAM's constitution and bylaws.  Respondent does not argue that this information will not be available in the Board hearing of the complaint.

The balance of hardships can be stated succinctly.  The original local union affiliated with an international.  The

**26**

structure of the affiliated union vis-a-vis the employer
bargaining and employee representation has not materially
changed.   The employer's refusal in response to recognize the
League or to bargain, leaving the employees without
representation and abrogating the bargaining unit, is a
significant hardship that greatly outweighs that of Respondent
having to recognize and negotiate with the affiliated League,
pending administrative determination of the N.L.R.B.'s complaint.
Respondent suffers no other hardship, and is not qualified to
speak for "other non-voting employees."   The balance of hardships
strongly favors Petitioner.

The balance of hardships favors issuing an injunction.

4.   The Public Interest

The public interest is to ensure that an unfair labor
practice will not succeed because the Board takes too long to
investigate and adjudicate the charge.  *Miller*, 19 F.3d at 460.
Petitioner's evidence supports its contention that without a
Section 10(j) injunction the union may not be able to benefit
from any relief ultimately granted by the Board.   Respondent
repeats its argument that the unit employees are not suffering
harm in the absence of an injunction because Respondent has
granted them wage increases pursuant to its final contract offer.
Doc. 32, Mem. in Opp., 25-26.   Even if true, this argument does
not address the continuing harm to the League itself or the
absence of representation on workplace and other issues a union
provides employees.

Respondent offers "protecting employers from the imposition
of sanctions based on unfounded unfair-labor-practice charges" as

**27**

1   a countervailing public interest.  Id., 26.  In determining

2   whether to issue an injunction, the court considers the merits

3   only to the extent of probability of final success.  Petitioner

4   has demonstrated a probability of success on the merits.  *See*

5   *Miller*, 19 F.3d at 460 ("Board can make threshold showing of

6   likelihood of success by producing *some* evidence to support the

7   unfair labor practice charge, together with an *arguable* legal

8   theory") (emphasis added).

9        Respondent argues that "a bargaining representative" should

10  not be "imposed by judicial fiat on a group of over 2,400

11  employees."  Doc. 32, Mem. in Opp., 26.  The injunctive relief

12  requested is not "judicial fiat," but rather is specifically

13  authorized by Congress under Section 10(j).  Respondent ignores

14  Petitioner's evidence that the status quo was union

15  representation, voting on the issue of affiliation was open to

16  all unit employees, and support among those voting was

17  overwhelming for affiliation.  Respondent's statement that "most

18  of the employees did not vote in favor of" the affiliation, while

19  technically accurate, is misleading because "most" employees did

20  not vote at all.  The First Circuit rejected a similar argument

21  in *Asseo*:

22       [T]he danger that the Union would lose support because

23       of unfair labor practices committed by the employer,

24       leading to irreparable injury to the employees and to

25       the bargaining unit, clearly outweighs any harm which

26       granting injunctive relief would inflict on the

27       defendant.  Indeed, the only argument which Turabo

28       seriously advanced at the district-court level was that

**28**

1    "granting the interim bargaining order will be

2    tantamount to imposing an unwanted Union on the

3    employees, which will create labor unrest and adversely

4    affect the Employer's prospects of obtaining necessary

5    financing to continue its operations."  We, like the

6    district court, fail to find merit in this contention.

7  *Asseo,* 900 F.2d at 454-55.

8    Respondent points to the apparent decline in voter turnout

9  between the elections held in November 2004 and those for

10 affiliation in September 2005, which it characterizes as "ad

11 hoc."  Id.  This suggests that Respondent infers diminished

12 employee interest in union representation because fewer employees

13 voted.  However, there is no issue here of an injunction

14 "nullify[ing] majority choice."  Respondent's claims of what

15 employees "want" are unsupported speculation as it has submitted

16 no evidence of employee preference.  *See Eisenberg v. Hartz*

17 *Mountain Corp.*, 519 F.2d 138, 143 (3d Cir. 1975).

18   Based on the reduction in overall employee voter turnout,

19 Respondent argues that the court should not "rush to judgment and

20 force [Respondent] to bargain with an organization that has not

21 yet demonstrated that it is the legitimate bargaining

22 representative of the appropriate bargaining unit."  Doc. 32,

23 Mem. in Opp., 26.  Petitioner's unrebutted evidence that

24 Respondent is taking advantage of present circumstances to

25 eliminate union representation, discourage employee participation

26 in a union, and hinder the union's recruitment effort greatly

27 weakens this argument.  A stay of proceedings would perpetuate

28 the alleged unfair labor practices, not alleviate the continuing

**29**

harms which Petitioner's evidence establishes.

Respondent claims that because an injunction would "merely require [Respondent] to meet and bargain in good faith with" the League, the relief would in fact have little impact.  Id., 26-27. However, Respondent's union-suppression efforts, according to evidence supplied by Petitioner and not rebutted by Respondent, gain their leverage from Respondent's position that no union represents its employees.  Requiring Respondent to recognize the League pending the N.L.R.B. decision and to cease its anti-union conduct will most fairly maintain the status quo to serve the N.L.R.A. purposes of not damaging union representation or the bargaining unit.

Respondent's unpersuasive delay argument has already been addressed above.

5.   Bond

Because Petitioner represents an agency of the United States, no bond is required.  *See* Rule 65(c), Fed.R.Civ.P.; *Squaxin Island Tribe v. State of Washington*, 781 F.2d 715, 723 (9th Cir. 1986).


**VI.   CONCLUSION**

For all the foregoing reasons, having fully considered the evidence, probable success on the merits, irreparable harm, balance of hardships, and the public interest, the petition for Section 10(j)injunction is GRANTED.  Petitioner shall submit a proposed form of injunction consistent with the law and this decision.  Petitioner shall file that order with the court within two (2) days following electronic service of this decision.

**30**

**SO ORDERED**

**DATED: March _28, 2006.**

                              **/s/ OLIVER W. WANGER**
                        _____
                             **OLIVER W. WANGER**
                        **United States District Judge**